UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ERIC BOULER, as administrator of the estate of MELVIN BOULER, deceased, | ) | |
| Plaintiff, | ) | |
| v. | ) | Cause No. 2:21-cv-86 |
| CITY OF GARY, INDIANA, et al., | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This case arises out of the tragic death of Melvin Bouler, who was shot multiple times by Officer Brandon Henderson of the Gary Police Department ("GPD") and died a couple of months later from his wounds. Bouler's personal representative brought this action against several defendants—Officer Henderson, the City of Gary, Gary Police Chief Richard Allen, and other officers who arrived on the scene after the shooting. [DE 45.] Bouler's second amended complaint has seven counts against the various defendants under 42 U.S.C. § 1983, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, the Indiana Constitution, and state tort law.

Defendants have moved for summary judgment on all claims. [DE 79.] The issues have been fully briefed, and Plaintiff has additionally moved to strike the declaration of retired FBI Agent Mark Becker, which the Defendants filed in support of their motion for summary judgment. [DE 87.] Plaintiff's motion to strike the declaration of Mark Becker will be granted for failure to substantially comply with 28 U.S.C. § 1746.

Defendants' motion for summary judgment will be granted as to the federal claims, and the Court relinquishes jurisdiction over the remaining state law claims.

## Background

### The Events of November 16 & 17, 2019

Melvin Bouler was an 82-year-old man living in Gary, Indiana who was cared for on occasion by a private home care aide named Tashanda DeBerry. [DE 86, Ex. 9.] DeBerry had been assisting Bouler for years by taking him to medical appointments, buying his groceries, and cleaning his home, amongst other assistive services. [DE 93, ¶¶ 2-3.]

On November 16, 2019, DeBerry asked Bouler to do her a favor: she asked him to pick up her daughter from her apartment and take her on a trip to the local skating rink. *Id.* at ¶ 7. During the outing, DeBerry's child reported back to DeBerry that Bouler was drinking heavily and complaining about Russ Stigger, an individual whom DeBerry was in a relationship with. *Id.* at ¶ 9. It's clear that Bouler was no fan of Stigger and Bouler wasn't afraid to say it. *Id.* The same day, Bouler repeatedly called DeBerry on the phone and cussed at her. [DE 86, Ex. 3, 19:15-20:2] Stigger was with DeBerry at the time and could hear Bouler during these calls. *Id.* Eventually, during one of the calls, Stigger took the phone from DeBerry and got into a verbal altercation with Bouler. Bouler called Stigger a "punk" and threatened to kill Stigger. *Id.* Eventually, Bouler dropped DeBerry's daughter back off at the house without incident. [DE 86, Ex. 10, 25:17-20.]

The next day, Bouler returned to DeBerry's residence. Bouler was drunk again, and heavily so. Bouler was cussing at DeBerry and threatening to harm her. [DE 93, ¶ 11.] Stigger, who had been out at the store, returned to the residence and found Bouler passed out on the ground outside the apartment. *Id.* at ¶ 12. Stigger testified that he saw that Bouler had a gun on him, which investigators would later identify as a loaded .357 Magnum caliber revolver. [DE 86, Ex. 3, 29:10-30:23; DE 86, Ex. 11, 2.] DeBerry and Stigger aroused Bouler from his stupor and helped him up, whereupon Bouler again started cursing at them and threatening them harm. [DE 93, ¶¶ 13-14.] Specifically, Stigger testified that Bouler was saying "I'll fuck you up" to him, and that Bouler stated "I'll shoot any motherfucker. I'll kill any motherfucker." [DE 86, Ex. 3, 38:23-39:15.] He also threatened to "kill[] everybody in the building." *Id.*

All of which prompted Stigger to call 911. [DE 93 at ¶ 14.] Matters went from bad to worse while Stigger was on the phone with 911; Bouler drew his gun and pointed it at Stigger. [DE 86, Ex. 3, 39:9-40:22.] Seeking protection, Stigger dove behind a wall in the vestibule of the apartment building. *Id*. at 40:12-41:2. Thereafter, Bouler went outside and got into his car. *Id*. at 41:3-16.

At 5:01 P.M., radio dispatchers requested that Officer Henderson and any available backup unit go to the address of DeBerry's apartment in response to a call about a possibly intoxicated man with a firearm yelling at people and pointing the weapon at individuals. [DE 86, ¶ 16; DE 86, Ex. 1, 137:5-6; DE 93, ¶ 15] During his 911 call, Stigger provided a description of Bouler as well as a description of his car, which the dispatcher relayed to Officer Henderson. [DE 93, ¶ 18.] Officer Henderson

acknowledged the request and told the dispatcher he was on his way. *Id.* at ¶ 16. Another officer also confirmed that he too was en route. *Id.* at ¶ 17.

About three minutes after he was dispatched, Officer Henderson arrived at DeBerry's apartment. *Id.* at ¶ 19. He was the first officer to arrive at the scene. [DE 86, ¶ 17.] When he arrived, Stigger was at the door of the apartment waving at him and pointing at Bouler's car. [DE 86, Ex. 3, 41:3-22.] Henderson saw Bouler sitting in the car and noted that Bouler matched the description of the potentially intoxicated man with a firearm that dispatch described. [DE 86, ¶¶ 18-19.] Henderson drew his firearm and kept it in the low and ready position as he approached Bouler's vehicle. *Id.* at ¶ 18.

When Henderson reached the front passenger side of Bouler's car near the hood, he loudly and repeatedly instructed Bouler to show his hands. *Id.* at ¶¶ 20, 50. According to Stigger, Henderson shouted "show me your hands" 8-10 times. [DE 86, Ex 3 at 43:11-16.] According to Officer Henderson, Bouler at first was not raising both hands and was instead fidgeting around his right pants area. [DE 86, ¶ 21.] Plaintiff disputes this, arguing that from his position and given his height, Henderson would be unable to see low enough to tell if Bouler was fidgeting around his waistband. *Id.* Regardless of whether he could see him ruffling in his pants, Henderson testified that Bouler then drew a revolver from his waistband and pointed it at him. *Id.* at ¶¶ 21-23. Henderson testified that he then, in fear for his life, fired multiple shots at Bouler. *Id.* at ¶¶ 23-24. Henderson discharged his firearm ten times, and Bouler sustained gunshot wounds to the abdomen, chest, thigh, and wrists. [DE 93, ¶¶ 28-29.] On January 4, 2020, Bouler passed away from his wounds. *Id.*

DeBerry's account of the incident is largely consistent with Officer Henderson's. She testified that, directly before the shooting, DeBerry had one hand on his steering wheel, and exactly when he raised his other hand, Henderson yelled "firearm" and "put down the weapon" before shooting. DE 86, Ex. 10, 60:9-22. DeBerry was standing behind Stigger at the front door to her apartment and testified that she "didn't see what he [Bouler] had in his hand." *Id.*

Plaintiff disputes that Bouler drew his pistol and pointed it at Officer Henderson. In an effort to create a genuine issue of material fact on this crucial point, Plaintiff relies on the deposition testimony of Stigger. *Id.* at ¶ 25. But Stigger's testimony did not contradict Henderson's. In other words, Stigger did not testify that Bouler did *not* draw a weapon; rather, he testified that he "can't say what he [Bouler] was doing in the car." [DE 86. Ex. 3, 98:3-99:21.] First, it was dark out and the area was not particularly well lit. *Id.* at 88:7-11. In addition, Stigger was not standing in the parking lot near the car. Instead, as noted above, he was standing in the doorway of the apartment during the shooting. *Id.* at 41:17-42:21. The fact that Stigger could not see what, if anything, Bouler was doing inside the car was a point repeatedly returned to during Stigger's deposition. And a review of that testimony makes it clear that Stigger could not see *one way or the other* what Bouler was doing inside the car. *Id.* at 90:22-25 ("I can't see into his (Bouler's) car."); 98:3-11 ("I couldn't see if (Bouler) held them up or he didn't. I don't know what he was doing at that point."); 99:19-21 ("I can't say what he was doing in the car."); *see also* 123:6-11 ("I couldn't see where his hands was at that time, I couldn't see… I couldn't see what he was doing."). In short, Stigger's testimony does not create an issue

of fact on the critical issue of whether Bouler pointed his pistol at Officer Henderson—he simply couldn't see what Bouler may have been doing.

Plaintiff also disputes whether Bouler actually heard anything Henderson was saying to him, asserting that Bouler was hard of hearing and wore hearing aids according to DeBerry. [DE 93, ¶ 4, 56.] Defendants contest that, pointing to testimony from Eric Bouler that Melvin Bouler did not have hearing aids, had no formal diagnosis of an auditory issue, and had not received treatment for hearing issues. *Id.* Plaintiff also points out that Bouler was parked in a handicapped parking space and had a handicapped license plate affixed to his car, and that Henderson was aware of these signs suggesting he was dealing with a disabled individual. *Id.* at ¶¶ 21, 39. Defendants contest that Henderson saw the handicapped signs, as he was approaching the car from the front. *Id.* at ¶ 39.

**Officer Henderson's Training**

Henderson graduated from the Northwest Indiana Law Enforcement Academy and became a patrol officer in 2013. [DE 86, ¶ 28, 29.] In the academy, Henderson was taught relevant principles of constitutional law and criminal law, including the use of force. *Id.* As a reserve officer, Henderson also received 40 hours of pre-basic classroom training. *Id.* at ¶ 25. Further, Henderson received Occupational Safety Health Administration training, firearm training, domestic violence training, and a variety of other training with yearly updates on the law. *Id.* at ¶ 26. When Henderson started as a patrol officer in 2013, he worked with a field training officer. *Id.* at ¶ 29. Henderson's training records indicate that he first received de-escalation training in October of 2022,

nearly three years after shooting Bouler. *Id.* at ¶ 30. However, Henderson testified that his field training officer trained him on how to deal with high-pressure, high-intensity situations. [DE 86, Ex. 1, 120:14-25.]

**Discussion**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

Plaintiff has brought seven claims against the defendants in this case, which the plaintiff summarizes as follows in the briefing:

- Count I: Unconstitutional Use of Excessive and Deadly Force (42 U.S.C. § 1983) in Violation of the Fourth and Fourteenth Amendments to the Constitution of the United States (versus Defendants City of Gary Police Officers in their Individual Capacity);

- Count II: Violation of Indiana Constitution (versus Defendants City of Gary Police Officers in their Individual Capacity);

- Count III: Failure to Supervise & Train Violation of Fourth and Fourteenth Amendment Rights (versus the City of Gary, Indiana and Chief Allen in his Individual Capacity);

- Count IV: Violations of the Americans with Disabilities Act Amendments Act of 2008 (ADAAA) And Section 504 of the Rehabilitation Act of 1973 (versus the City of Gary); Count V: Negligence (versus All Defendants);

- Count VI: Adult Wrongful Death (I.C. § 34-23-1-1, et al.) (versus All Defendants); and,

- Count VII: Violation of Indiana's Tort Claims Act (IC § 34-13-3 et al.) (versus City of Gary police officers in their Individual Capacity).

DE 85 at 3-4 (cleaned up). The below will deal with each count in turn.

**1. Unconstitutional Use of Excessive and Deadly Force**

Section 1983 provides a remedy for violations of federal rights committed by persons acting under color of state law. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Plaintiff, as personal representative of the estate of the deceased, has brought a claim against the involved GPD officers in their individual capacity, namely, Officer Henderson, for the use of excessive and deadly force against Bouler.

To determine whether the force employed by an officer is excessive or not under the Fourth and Fourteenth Amendments, courts look to the particular facts of the case and consider if it was "objectively reasonable (without the benefit of hindsight) for an officer to conclude that "the suspect poses an immediate threat to the safety of the officers…." *Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) (quoting *Graham v. Connor,* 490 U.S. 386, 396–97 (1989)). "Deadly force… is reasonable where an officer has reasonable cause to believe that the suspect poses a danger of serious bodily harm, such

as when the officer believes the suspect has a weapon or has committed a violent crime." *Id.* The Seventh Circuit recently reinforced this rule in *Manery v. Lee*, when it found that deadly force may "be used if the officer has probable cause to believe that the armed suspect (1) poses a threat of serious physical harm, either to the officer or to others, or (2) committed a crime involving the infliction or threatened infliction of serious physical harm and is about to escape."124 F.4th 1073, 1079 (7th Cir. 2025) (internal quotation marks omitted).

On November 17, 2019, Henderson was responding to a call involving an armed individual. Henderson testified that when he arrived, he approached Bouler and, while commanding him to show both of his hands, Bouler drew a firearm and pointed it at him. [DE 86, Ex. 1, 159:10-22.] Henderson's testimony is consistent with DeBerry's testimony, in which she said that she heard Henderson shout "firearm" and "put down the weapon" and then heard shots being fired. [DE 86, Ex. 10, 69:9-22]

Plaintiff argues that this is a disputed issue of material fact because "Stigger – who observed the entire incident from close range – testified unequivocally that he did not see a weapon in Mr. Bouler's hands when the fatal shots were fired." [DE 85, 11.] But that is not what Stigger said. Stigger did not testify that he had a clear view and that Bouler did not have a weapon in his hand. Instead, he testified (repeatedly) that he did not have a good view of what Bouler was doing inside the car in the moments before the shooting. Stigger could see that Bouler was in the vehicle, but with regard to whether Bouler held up his hands or not, Stigger testified that "I couldn't see if he held them up or he didn't. I don't know what he was doing at that point." "[DE 93, Ex. 3,

90:22-25, 98:3-11.] And when asked if he saw whether Bouler pointed a gun at Henderson, Stigger testified that "I didn't see that. *I can't say what he was doing in the car*." *Id.* at 99:15-21 (emphasis added). It is not surprising that Stigger did not have a good view of what Bouler was doing in the car; it was dark out and he was standing in the doorway of the apartment, not near the car in the parking lot. *Id.* at 41:17-42:21, 88:7-11.

So, this is not an instance where two eyewitnesses testified to seeing different things. Instead, it is an instance where one eyewitness testified unequivocally to seeing Bouler draw and point his weapon, and the other testifying to not being able to see what Bouler was doing one way or the other. That does not create a genuine dispute of material fact. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (holding that an officer's testimony that he did not see a gun from far away with an obscured view did not create a genuine issue of material fact when other officers at the scene stated the suspect brandished a gun); *Smith v. Kilgore*, 2017 WL 5709569, at *6 (W.D. Mo. Nov. 27, 2017) (holding that eyewitnesses stating that they did not see a weapon one way or the other did not "directly contradict" an officer's statement that the suspect had a weapon), *aff'd* 926 F.3d 479 (8th Cir. 2019).

I recognize there is an inherent difficulty in a deadly force case such as this one where "the person most likely to rebut the officers' version of events—the one killed—can't testify." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014). In such a case, to ensure fairness, I need to "scrutinize all the evidence to determine whether the officers' story is consistent with other known facts." *King v. Hendricks County*

*Commissioners*, 954 F.3d 981, 985 (7th Cir. 2020). In *Kings v. Hendricks*, the Seventh Circuit contended with far more allegedly inconsistent issues with the officer's testimony, including whether the deceased had a weapon on them at all at the time of the shooting, why the deceased would be carrying the weapon in their non-dominant hand as the officer testified, the deceased's weapon not having their fingerprints on it according to the plaintiff's experts, and inconsistencies between the trajectory of how the deceased was shot when compared to the officer's account of the incident. *King*, 954 F.3d at 985-86. The Seventh Circuit still affirmed summary judgment for the defendants, deciding that those arguments and inconsistencies did *not* undermine the key testimony of the officer and that the plaintiff's argument relied on "speculation or conjecture" to support a "theory that the officers shot [the deceased] for no reason." *Id.* at 986.

This case has comparably fewer alleged inconsistencies even than *King*. It is undisputed that Bouler had a gun on his person that night. It is undisputed that he was threatening individuals, that he pointed the gun at Stigger and that Henderson went to the scene to respond to a 911 call about an aggressive man with a firearm. Henderson's testimony is not materially inconsistent with the testimony of any of the other witnesses on the key issue of Bouler drawing his weapon, nor is his version of events inconsistent with the scene of the shooting. Plaintiff has disputed whether Henderson would have been able to see if Bouler was grabbing something from his waistband but does not dispute that he would be able to see the weapon if drawn, held up, and pointed at him as he testified. In fact, the issues in this case that may be viewed as disputed, such as

whether Bouler heard and understood Henderson, do not undermine the key testimony by Henderson: that Bouler drew and pointed his weapon at him.

In sum, because it is not genuinely disputed that Bouler drew and pointed his weapon at Henderson, it is uncontested that Bouler posed a serious risk of bodily harm to Henderson. Accordingly, I must find that the use of deadly force was reasonable and thus constitutional. *Henning*, 477 F.3d at 496. And because I find that there is no constitutional violation, I need not reach the issue of qualified immunity. *See Logan v. City of South Bend*, 564 F. Supp. 3d 719, 739 (N.D. Ind. 2021) ("Because the court grants summary judgment on the excessive force and equal protection claims, the court need not reach the issue of qualified immunity because that leaves no evidence of an underlying constitutional violation.").

2. **Failure to Supervise and Train**

Plaintiff brought a *Monell* claim in this case on the theory that the City of Gary failed to supervise and train its officers in the use of de-escalation tactics, interacting with disabled individuals, and the proper use of force. However, where there is no underlying constitutional violation, a *Monell* claim cannot survive. *Windle v. City of Marion,* 321 F.3d 658, 663 (7th Cir. 2003). Because I granted summary judgment on the excessive force claim and there is no underlying constitutional violation, I grant summary judgment on the *Monell* claim as well. *Schor v. City of Chi.*, 576 F.3d 775, 779 (7th Cir. 2009) ("In order to support such a claim, however, the plaintiff must begin by showing an underlying constitutional violation, in order to move forward with her claim against the municipality.").

The same goes for the claim brought against Police Chief Allen in his individual capacity for failing to supervise and train Henderson. Because I find that there is no underlying constitutional violation, Defendants' motion for summary judgment is also granted on this claim. *Rascon v. Hardiman*, 803 F.2d. 269, 273-74 (7th Cir. 1986).

3. **Americans with Disabilities Act & Rehabilitation Act Claim**

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *King*, 954 F.3d at 988 (quoting 42 U.S.C. §12132). Claims under section 504 of the Rehabilitation Act are treated as "functionally identical" and can be considered together with claims under Title II of the ADA. *Id.* (citing *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015)).

A fundamental requirement of this claim is that a plaintiff show that "but for his disability, he would have been able to access the services or benefits desired." *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006) (internal quotation marks omitted). Plaintiff argues that he has made this showing because (1) "Bouler's behavior suggest[ed] confusion or inability to hear" and his vehicle had handicapped markings that, if observed, would have suggested to Henderson that he was dealing with a disabled individual, [DE 85, 20] and that (2) in this context, Henderson should have used de-escalation tactics such as "waiting for backup, using cover, assessing impairments." *Id.*

The Seventh Circuit's reasoning in *King* is, once again, relevant here. In *King*, the Circuit affirmed summary judgment against an ADA and Rehabilitation Act claim because there was "no competent evidence contradicting Hays's account that he shot Bradley because Bradley ran at him with a knife. We have been given no reason to believe that Hays's response would have been different had someone not suffering from a mental illness done the same thing…." *King*, 954 F.3d at 989.[1] As described above, there is no evidence genuinely disputing that Bouler drew and pointed his gun at Henderson. In this case, it is disputed whether Bouler could hear what Henderson was saying, and even if Bouler had a hearing impairment at all. But even assuming he did have a hearing impairment and did not hear what Henderson said, drawing a gun on a uniformed police officer standing in front of his car was the cause of Henderson's actions, and I have been given no reason to believe Henderson's response would have been any different if Bouler did not have any hearing problems.

With regard to Plaintiff's argument that Bouler should have taken actions that would have avoided the situation altogether (waiting for backup, staying in cover, assessing for impairments), a reasonable jury could not find that failure to take such actions in this context constituted discrimination on the basis of Bouler's disability. The Seventh Circuit has held that "exigent circumstances may shed light on the reasonableness of an officer's actions" in the context of an ADA claim, and they do so

[1] Plaintiff stated in an explanatory parenthetical for *King* that the case was "reversing dismissal where factual issues existed on disability." [DE 85, 20.] However, *King* was affirming summary judgment for defendants, not reversing dismissal. In a letter to the Court dated May 7, 2026, Plaintiff's counsel noted their error and provided a new explanatory parenthetical.

here. *Gray v. Cummings*, 917 F.3d 1, 17 (7th Cir. 2019). It is undisputed that dispatch told Henderson that a man with a firearm was at an apartment complex and was acting in a threatening manner. He was not told that the suspect was disabled. When he arrived, he not only noted a suspect matching the description, but was pointed directly to Bouler by an individual at the scene: Stigger. This was an exigent circumstance where an officer was responding to a call about a man threatening people with a gun. Henderson's decision to approach the suspect instead of waiting for backup, assessing for impairments, and/or taking cover in this situation was tied to the exigency, not Bouler's disability. *See generally King*, 954 F.3d at 989 (finding that officer's "failure to disarm, or take the decedent under control, was not because he was inadequately trained to deal with disabled individuals… if the decedent was denied access to medical services it was because of his violent, threatening behavior, not because he was mentally disabled.") *Id.* (quoting *Thompson v. Williamson Cnty., Tenn.*, 219 F.3d 555, 558 (6th Cir. 2000).

Plaintiff's reliance on *Spencer v. Dawson*, 2006 WL 3253574 (N.D. Ill. Nov. 7, 2006) is unavailing. In that case, the court denied summary judgment on a Rehabilitation Act claim where officers arrested and pepper sprayed a deaf person for using threatening gestures that the plaintiff claimed were actually sign language. *Id.* at *11. Plaintiff claims this case "mirrors" the facts of that case, but I disagree. [DE 85, 19.] The plaintiff in *Spencer* asserted that he was not threatening anyone's safety, and there is no evidence the plaintiff in that case was armed, much less that he pointed a weapon at an officer. The plaintiff in *Spencer* asserted he was trying to communicate with the officers using

sign language, and that the officers took the gestures as a threat and pepper sprayed and arrested him. That could constitute discrimination on the basis of his disability, as the officer's response was related to the plaintiff's disability, specifically, the plaintiff's use of sign language because he was deaf. Henderson using deadly force in response to a firearm being pointed at him is not a response borne out of Bouler's hearing impairment, it is borne out of being threatened with a firearm. *King*, 954 F.3d at 989. The motion for summary judgment is granted as to the ADA and Rehabilitation Act Claims.

**4. State Law Claims**

This only leaves Plaintiff's state law claims. "When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010); *see also Lerma v. Bollow*, 2025 WL 744029, at *12 (N.D. Ill. Mar. 7, 2025) (relinquishing supplemental jurisdiction over state law claims when summary judgment was granted to defendants on federal claims). This presumption is based on a "legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012) (internal quotation marks omitted). Accordingly, as Defendant's motion for summary judgment is granted on all federal claims, the Court relinquishes its supplemental jurisdiction over the remaining state law claims.

**5. Motion to Strike**

Plaintiff moved to strike the three-page declaration of Mark Becker. Becker is a former police chief and FBI agent, and his declaration, which contains his opinions on

the case, was offered by Defendants. Plaintiff asserts that Becker's declaration is in violation of 28 U.S.C. § 1746 because it was unsworn and did not claim to be true and correct under penalty of perjury. Defendants conceded that the declaration was missing key, required language, and do not attempt to argue that the declaration should be considered. [DE 94, 2.] Instead, Defendants simply point out that none of their points in their Statement of Material Facts depend on Becker's declaration, and that the declaration is "is not detrimental in support of the Defendants' Motion for Summary Judgment[.]" *Id.* I grant the motion to strike the declaration and note that I did not rely upon the declaration in coming to my decisions in this case.

## Conclusion

For the reasons stated above, Plaintiff's motion to strike [DE 87] is GRANTED and Defendants' motion for summary judgment [DE 79] is GRANTED.

**SO ORDERED**.

ENTERED: August 18, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT